IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 9, 2015

# JERRY CRAWFORD, JR. v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Madison County**
**No. C-15-83      Roy B. Morgan, Jr., Judge**

**No. W2015-00882-CCA-R3-PC  -  Filed March 31, 2016**

A Madison County jury convicted the Petitioner, Jerry Crawford, Jr., of aggravated robbery, and the trial court sentenced him to thirty years in prison. The Petitioner appealed his conviction and sentence, and this Court affirmed the trial court's judgments. *See State v. Jerry Crawford, Jr.*, No. W2012-02729-CCA-R3-CD, 2014 WL 296014, at *1 (Tenn. Crim. App., at Knoxville, Jan. 28, 2014), *no Tenn. R. App. P. 11 application filed*. In 2015, the Petitioner filed a *pro se* petition for post-conviction relief. The post-conviction court appointed counsel who filed an amended petition for post-conviction relief alleging that the Petitioner had received the ineffective assistance of counsel. The trial court held a hearing on the petition and denied relief. On appeal, the Petitioner contends that the trial court erred when it denied his petition. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Jerry Crawford, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Meredith Devault, Senior Counsel; Jerry Woodall, District Attorney General; Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Procedural History

This case arises from a robbery that occurred at a Circle K convenience store in Jackson, Tennessee. For this offense, a Madison County grand jury indicted the

Petitioner for one count of aggravated robbery.

## A. Trial

In our opinion on the Petitioner's direct appeal of his conviction and sentence, this Court provided a summary of the evidence presented at trial:

> Jane Long testified that, in November 2010, she was employed as a manager at the Circle K convenience store ("the store") on the Highway 45 Bypass in Jackson, where she worked the third, or "graveyard," shift from 10:00 p.m. until 6:00 a.m. On November 6, 2010, Ms. Long was working alone at the store when a customer entered at approximately 1:50 a.m. Ms. Long, who had been stocking a cooler, proceeded to the cash register to wait on the customer. When she asked if she could assist him, the customer handed her a note which read, "I have a gun pointed at you." Ms. Long immediately opened the cash register drawer and began handing him cash from the drawer. Ms. Long testified that no handgun was visible but that the robber "had his hand in his [jacket] pocket," which Ms. Long "believed was the gun." Ms. Long further explained that the robber was waving this hand around while it was still in his pocket, and she heard the sound of something metallic hitting the metal cash register. Ms. Long believed that the sound she heard was that of a handgun striking the cash register. Ms. Long affirmed that she was fearful of being shot or killed.
>
> Ms. Long gave the robber the cash from the register drawer, which she recalled amounted to "probably a ten, a fi[v]e and some ones," and the robber stated, "B * * * *, I know you got more f* * * * * * money than this." Ms. Long then opened the second cash register, and as she was removing cash from the drawer, the robber stated, "B * * * *, I'll kill you." Before Ms. Long could hand the robber the cash from the second drawer, the robber requested three cartons of cigarettes. Ms. Long handed the cash to him, totaling approximately $150 between the two registers, and the man left the store with the cash but without the cigarettes. Ms. Long testified that she immediately locked the door and called the police.
>
> Ms. Long affirmed that the store was equipped with video surveillance equipment, and, through her testimony, the State introduced into evidence surveillance footage from the early morning hours of November 6, 2010, which showed the robbery unfold as Ms. Long had previously described. At 1:50:40 a.m., a black man entered the store, and Ms. Long identified for the court the man in the video as the [Petitioner].

2

Ms. Long also identified the handwritten note that the robber handed to her, which read "My gun is pointed at you. Give me the money."

On November 10, 2010, an investigator with the Jackson Police Department ("JPD") showed Ms. Long a photographic lineup, from which Ms. Long identified the [Petitioner] as the man who robbed the store.

On cross-examination, Ms. Long admitted that, prior to November 6, she had never seen the [Petitioner]. With respect to the photographic lineup, Ms. Long testified that she "didn't even have to hesitate" and said, "As soon as [the investigator] handed [the lineup] to me, soon as she showed me, I said 'That's him right there.'" Ms. Long explained that, once the robber left the store, she "was really freaked out." She retrieved her cellular telephone and called another store manager to ask for the telephone number of the police department. Before the store manager could answer, Ms. Long realized that she needed to call 911, so she ended the call and then called 911 from the store telephone.

JPD Officer Thomas Brea testified that, in the early morning hours of November 6, 2010, he responded to a call of an aggravated robbery at the store. When he arrived, Ms. Long advised him that the robber had handed her a note, which Officer Brea collected and sealed inside an evidence bag. Officer Brea identified the note for the jury.

On cross-examination, Officer Brea confirmed that the note was folded and lying on the store counter when he arrived at the scene.

Deputy Lashunda Perry with the Madison County Sheriff's Department ("MCSD") identified a criminal fingerprint card, which contained all of the [Petitioner's] fingerprints.

William L. Roane, a forensic latent print examiner with the JPD, testified as an expert. Mr. Roane testified that he had examined the note recovered from the store for fingerprints. Once he had identified six "prints of value," he ran one of the fingerprints through the Federal Bureau of Investigation's "AFIS" system and was able to determine that the fingerprint belonged to the [Petitioner]. Mr. Roane was later able to compare the [Petitioner's] fingerprints on the criminal fingerprint card on file with the MCSD with those found on the note, and he was able to identify three of the [Petitioner's] fingerprints on the note, which included the print identified through AFIS.

3

On cross-examination, Mr. Roane acknowledged that three fingerprints and one palm print on the note did not belong to the [Petitioner], and he was unable to determine the origin of those prints.

JPD Investigator Susan Cole testified that the [Petitioner] became a suspect in the aggravated robbery of the store following the discovery of the [Petitioner's] fingerprints on the robbery note. Investigator Cole prepared a photographic lineup, which included the [Petitioner's] photograph, and, on November 10, she showed it to Ms. Long, who positively identified the [Petitioner] as the robber.

Lieutenant Shannon Hughes with the Crockett County Sheriff's Department ("CCSD") testified that, on November 28, 2010, she was working at the Crockett County jail, and she allowed the [Petitioner] to make a telephone call. Lieutenant Hughes stood approximately eight to 10 feet from the [Petitioner] while he was making his call, and she was able to overhear portions of his conversation. Lieutenant Hughes testified that, to the best of her recollection, the [Petitioner] stated "to the other party something about getting a letter, and if they would do what was asked in that letter, he would be coming home pretty soon." An audio recording of the [Petitioner's] telephone conversation was entered into evidence, in which the [Petitioner] is overheard making the aforementioned statement. Lieutenant Hughes stated that this statement by the [Petitioner] "raise [d] a flag," and Lieutenant Hughes recalled that the [Petitioner] had written a letter earlier that same day.

CCSD Deputy Wes McGullion testified that he was working in the Crockett County jail on November 28 and that Lieutenant Hughes informed him of a potential situation involving the [Petitioner]. Deputy McGullion listened to the audio recording of the [Petitioner's] telephone conversation, and he recalled that the [Petitioner] said "something to the effect of, 'when you get these letters, tear them up, you know. If you do this for me, babe, I'll be out of here.'" Deputy McGullion also recalled the [Petitioner's] making a statement about "taking the charge" for him. After listening to this recording, Deputy McGullion retrieved two letters written by the [Petitioner] and delivered them to Lieutenant Penny Curtis. Deputy McGullion identified the first letter from the [Petitioner] as addressed to Dominique Mitchell and the second letter addressed to Erika Brooks, purporting to be from the [Petitioner's] alias, Jerry Fenner.

4

CC SD Lieutenant Penny Curtis testified that she was in charge of the criminal investigations division. She testified that she was familiar with the [Petitioner], and, from a series of still photographs taken from the store's video surveillance footage, she identified the [Petitioner] as the robber of the store. Lieutenant Curtis also identified a kelly green sedan with the word "Celtics" printed on the passenger side doors, which was visible in front of the store moments before the [Petitioner] entered, as owned by Dominique Mitchell, the [Petitioner's] girlfriend. With respect to the recorded telephone conversation at the Crockett County jail, Lieutenant Curtis identified the voices on the recording as those of the [Petitioner], Dominique Mitchell, and Erika Brooks.

Lieutenant Curtis identified the letter written by the [Petitioner] to Dominique Mitchell, which contained three pages. The first page was a copy of the [Petitioner's] arrest warrant, which contained a narrative of the robbery of the store and a handwritten note below the narrative stating, "This is what happened," with a line and arrow pointing to the affidavit. At the bottom of the page, another handwritten note stated, "Baby call this person," with an arrow connecting the name of Investigator Cole and her telephone number. The second page, which was entirely handwritten in pencil, stated as follows:

> Baby I got three charges in all one in Gibson, one in Crockett and that robbery in Jackson. That's the one I can't shake. Since you're only 17 I need you to really represent for me and take that charge at that store.
>
> By you being only 17 they will take you to the [Juvenile] Court in Jackson and they will take the charge off me and give it to you. Now Baby they will try everything in their power to say you are protecting me, and they will say they know for a fact that it was me cause they got my finger prints, and the lady (white lady) at the store did a photo line-up and picked me out of the group. Now when they say this - This is what you say . . . I took the sheet of note book paper off his moms table and I wrote I have a gun pointed at you give me the money b[* * * *]. That how his prints was on it and thats how it happen. I walked in the Circle K store around four that morning and I waited for the lady to come up from the back of the store and I said I have a note for you, and she read it and gave me about $150.00 one hundred and

5

fifty dollars and I walked out the store heading towards the back and begin to run, thats when I got away. If they ask you had on a Army colored hat that fit around your whole head, and you had my black coat on with some white jogging pants with the red stripes going down the side with some white and blue Js. Baby I got Gibson and Crockett beat. I just need you to do this one. See Baby Jackson wants me bad so you needs to convince them that it was really you. They may ask if you know me say yes. They may even say they will bound you over but I swear don't believe it. You are about to be 18. They can't do nothing they may even say you will get ten years cause of this but baby everything I be saying comes true right so if I know you like I do then you got this for me right,? ? ? I love you. Just call the Jackson Police Dept. and tell them, # 425-8400. If they ask what store, you know where Big K Mart is – it's the store right across the street from it at the corner. When you tell them this keep the same story and they gots to let me go, and you will be on probation til you turn 18. We will back together like always. I love you, sorry so [illegible] sleepy. Tell them you went in looking like a boy cause you knew you would get away with it.

The third page, again handwritten in pencil, primarily contains statements by the [Petitioner] professing his love for Ms. Mitchell, but, in the middle of the page, the [Petitioner] tells Ms. Mitchell that, "I need you, and I feel in (call investigator S. Cole 425-8400 and that all you need to tell) my heart that you will go to Jackson and tell the investigator S. Cole what happen that's why I put the paper of what happen in there so you'll know." The back of the second page contains a short, handwritten love letter in black ink, signed "Jerry." A fourth page contains a short, handwritten note in pencil, entitled, "To my love on our wedding day," signed by "Jerry Fenner."

The second letter, contained in an envelope addressed to "Erica Brooks" but written to Ms. Mitchell, is handwritten in black ink:

Hello Baby Girl how are you? I'm not doing so good, cause I miss you so so much and it kills me inside to not be there. I can't wait til we are back together. I herd [sic] you and Erica came up here today. I was so upset I couldn't see you. But on that biz that you're gonna do for me will get us

6

back together next month. I got the charge here beat in Alamo, and Humboldt, but you gotta take the one in Jackson. When you go there look like a tomboy have a hat on some big pants and that black coat.

They will try their best to say you are lying for me, but keep saying I'm not lying I did it and they will be like well how did Mr. Crawford prints get on the note that said give me the money my gun is pointed at you. You will say we was over his moms house playing cards and he was keeping the score and thats how it got on there. The next question they may ask is, well the clerk at the store saw his face and pointed him out. Then you say she is lying it was me, she couldn't see my face cause I had a Army hat covered half of my face.

By this time the investigator will be mad as hell cause they want me bad and you come in and f[* * *] s[* * *] up, so this is the point where he will start lying . . . saying things like so you're willing to go down for him? You say I'm not going down for no one, I did it. Then he will say why did you do it? You say cause my Grandmom told me I have 37 hours to get out of her house and I was sleeping in my car, so I had no choice. Then he might say something like . . . well if I charge you with this, you will be facing twenty years or some shit like that. He trying to spook you into saying it was me. Whatever he say just keep your story and don't change it for nothing. This is whats really about it make them mad . . . when they ask how old are you and you say 17 he will be like damn, Jerry is smart that's why she's doing this cause she knows we can only hold her until she's 18 and they both will be free. (f[* * *] ) Thats what he will say. But before he breaks down and realizes that you're not giving in he will try one last scare tatic [sic] which is well we will bound you over as an adult and you'll hate you took the charge. Then you say I did the crime so I gotta do the time right. He'll say you're f[* * * * * *] right about that.

After a few more paragraphs in which the [Petitioner] gloats that law enforcement officials will bemoan the fact that "Jerry done got away" and that the [Petitioner] and Ms. Mitchell orchestrated "some bonnie and clyde type" of activity, the [Petitioner] warns Ms. Mitchell that the prison

7

officials "read our letters so don't say nothing. Talk in codes." The letter then continues with more statements of the [Petitioner's] love for Ms. Mitchell and a request that Ms. Mitchell retrieve a wedding ring "from [B]uddies on Highland and put it on your finger." Before ending the letter, the [Petitioner] once again instructs Ms. Mitchell to "call Jackson and tell them you wanna confess to something and I'll be on my way home."

Dominique Mitchell testified that she was 17 years of age in November 2010 and that she was, at that time, in a romantic relationship with the [Petitioner]. Ms. Mitchell confirmed that she resided with her grandmother in November 2010 and that the letter the [Petitioner] had written to her from jail was addressed to her at her grandmother's address, although she never actually received that letter. Ms. Mitchell also confirmed that she and the [Petitioner] were friends with Erika Brooks. Ms. Mitchell reviewed a still photograph taken from the video surveillance at the store on the night of the robbery and admitted that the green sedan emblazoned with the word "Celtics" that was visible in front of the store was, in fact, her vehicle. Ms. Mitchell also reviewed two still photographs that showed the robber entering the store on the morning of November 6, and Ms. Mitchell identified the [Petitioner] as the man in those photographs. With respect to the [Petitioner's] time in jail in November 2010, Ms. Mitchell testified that she received a "multitude" of telephone calls from the [Petitioner] from jail in which he asked her if she was "still gonna do it for him," which she acknowledged referred to his requests that she admit to perpetrating the robbery.

On cross-examination, Ms. Mitchell admitted that, when she initially spoke with someone from the JPD, she denied that the [Petitioner] had possession of her car on the morning of the robbery. Ms. Mitchell acknowledged that she later visited the JPD and admitted that the [Petitioner] "had [her] car on November the 6th."

Erika Brooks testified that she was familiar with the [Petitioner] through his relationship with Ms. Mitchell. Ms. Brooks admitted that the letter the [Petitioner] attempted to send her from jail was properly addressed to her at her residence in November 2010. Ms. Brooks also reviewed the photograph of the green sedan that was visible outside of the store on November 6 and confirmed that the vehicle was owned by Ms. Mitchell but that Ms. Mitchell allowed the [Petitioner] to drive it.

With this evidence, the State rested its case. Following a Momon

8

colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the [Petitioner] elected to testify.

The [Petitioner] testified that his name was Jerry Crawford, Jr. but that he sometimes used the name Jerry Fenner because Fenner was his Father's surname. The [Petitioner] admitted that he had been convicted of "several" crimes in the past, including multiple burglary, theft, and vandalism convictions in the counties of Madison, Chester, Crockett, Gibson, Hardeman, Carroll, Dyer, and Henderson, following a 2003 "crime spree."

The [Petitioner] stated that he was familiar with Ms. Long, the store manager, because "she buys pills from me." The [Petitioner] testified that he had met Ms. Long in mid-October 2010 when he was standing outside a store in Jackson "smoking a blunt." The [Petitioner] stated that Ms. Long approached him and inquired about purchasing some pills. The [Petitioner] sold her five Xanax pills for five dollars apiece. At Ms. Long's request, the [Petitioner] provided her with his telephone number, and Ms. Long contacted him periodically to purchase more pills.

With respect to the events of November 6, the [Petitioner] claimed that Ms. Long contacted him at approximately 10:00 p.m. on November 5 and requested some pills "on credit." The [Petitioner] said that he could not comply because he had to have money to feed his children and because Ms. Long had not paid for pills that she had previously purchased on credit. Ms. Long called back two hours later and told the [Petitioner] that she "got a way that you can get paid and get a little bit extra on top." The [Petitioner] was intrigued, and he testified that the following telephone conversation ensued:

[Ms. Long] said, "Well, you'll have to come in and act like you're robbing me." I said, "Well I can't rob you, I don't have a gun." She said, "You ain't got to have a gun. Just hold your hand in your pocket and make it look like it." I said, "Okay, I can do that." She said, "When you come, make sure you have -- you bring those pills." I said, "Okay. What you want me to do this, sit them on the floor or something when I'm heading out the door?" She was like, "No, just put them in a piece of paper." She said, "Better yet, just write a note or something and make a note and put on there like 'This is a stickup' or you gotta gun. Just put something on there, that way you can put the pills in there and you can hide that from the camera, and on top of that, I'll be explain [sic] to the police that I was being

9

held up." I was like "Okay."

The [Petitioner] described the Xanax pills as "the size of a rice grain." The [Petitioner] testified that Ms. Long called him around "1 something" on November 6 and told him to come to the store. The [Petitioner], who resided close by, proceeded to the store in the "green Boston Celtics Crown Victoria." The defense attorney then played the video surveillance footage, and the [Petitioner] identified himself entering the store. The [Petitioner] stated that the only item in his pockets was the folded note containing the pills that he intended to give Ms. Long. The [Petitioner] claimed that Ms. Long did not completely unfold the note when he handed it to her because "she already knew what it said." The [Petitioner] denied that he had a gun in his pocket, claiming instead that it was only his left hand and that he was "acting like [he was] pointing something at her." The [Petitioner] recalled that he did call Ms. Long a "b[* * * *]" to "make it look real."

The [Petitioner] testified that, approximately five seconds after he left the store, Ms. Long called his cellular telephone to inquire whether the [Petitioner] had managed to leave the parking lot next to the store. When the [Petitioner] replied that he had, Ms. Long told him she was going to contact the police but promised him "that she would make sure [he] got away before she called the police." The [Petitioner] stated that he recognized the number because Ms. Long had called him about "20 times" and that he would "never forget that number."

The [Petitioner] admitted that he had contacted Ms. Mitchell following his arrest in an attempt to convince her to confess to the robbery. He stated that he "should have never did that, and I'm glad that she never received any of them letters because it's not fair for her to go down for something that I did, me and [Ms. Long] did." The [Petitioner] denied that he received $150 from the store's cash registers, claiming that Ms. Long gave him only $63.

The [Petitioner] testified that he was never interrogated about the robbery and that he was never given a chance to explain his story to law enforcement officers.

On cross-examination, the [Petitioner] admitted that he had received a copy of the indictment, which contained both Ms. Long's name and her cellular telephone number, although he later claimed that he had never

received a copy of the indictment which contained Ms. Long's telephone number. When asked if he had ever told any law enforcement officers about Ms. Long's involvement in the robbery, the [Petitioner] responded that "they never came and talked to [him]." The [Petitioner] admitted that he had attempted to convince Ms. Mitchell to confess to the crime and that he was "not above having people come in here and lie to a jury of 12 of your peers."

*Crawford*, 2014 WL 296014, at *1-7.

The jury convicted the Petitioner of aggravated robbery and the trial court sentenced him to thirty years of incarceration, to be served consecutively to his sentence in a separate case from Crockett County. The Petitioner appealed to this Court, alleging that the evidence adduced at trial was insufficient to support his conviction, that the prosecutor committed misconduct by impermissibly shifting the burden of proof to the defendant during closing argument, and that the sentence imposed was excessive. *Id.* This Court affirmed his convictions and remanded the case on the matter of the Petitioner's sentence, unrelated to this appeal. *Id.* at 11.

## B. Post-Conviction Proceedings

The Petitioner then filed a petition for post-conviction relief, *pro se*, in which he alleged that he had received the ineffective assistance of counsel. The post-conviction court appointed counsel, who filed an amended petition alleging that the Petitioner had received the ineffective assistance of counsel because: (1) his trial counsel ("Counsel") did not subpoena Ms. Long's cell phone records to prove she did not immediately call police; (2) Counsel failed to request a jury instruction for facilitation, conspiracy, and solicitation; (3) Counsel "failed to exclude" the Petitioner's prior conviction; and (4) Counsel failed to research and prove that the Petitioner's prior convictions were subject to merger because they had occurred within a twenty-four hour period.

The post-conviction court subsequently held a hearing, during which the following evidence was presented: the Petitioner testified that he had been charged with aggravated robbery and was represented by Counsel, a lawyer from the Public Defender's Office. The Petitioner testified that he never had the chance to talk to investigators after his arrest about "what was really going on," so when Counsel was appointed to represent him, the Petitioner told counsel that Ms. Long was not the victim but a co-defendant and that he could prove she was buying pills from the Petitioner. He informed counsel that Ms. Long would have Xanax and crack cocaine in her system and that counsel should request that Ms. Long submit a urine sample. Counsel told the Petitioner that he could not get a urine sample from Ms. Long. The Petitioner also told Counsel to contact county hospital

11

where Ms. Long used to work and from where she had been fired for stealing syringes. The Petitioner testified that he asked Counsel to take other steps, including obtaining Ms. Long's phone records, to prove she was not a victim in this case, but Counsel would not do what the Petitioner asked. The Petitioner testified that the video recording from inside the store showed that Ms. Long recognized him and knew him because she waved and smiled at the Petitioner.

The Petitioner admitted that he had implicated himself in his letters to Ms. Mitchell, asking her to lie for him, but that Ms. Long was also not credible and should have been challenged. He stated that Ms. Long set the "whole thing up" and that he went along with it because she owed him money. The Petitioner testified that he met Ms. Long on Hollywood Drive when she asked him for some Xanax and gave him her phone number. He stated that Ms. Long would call him and ask for some "medicine," and he would take it to her at the store where she worked. The Petitioner asked Counsel to get the video recording from the day the Petitioner and Ms. Long met, to prove they knew each other before the robbery, and Counsel "would not get the video [recording] of that for nothing." The Petitioner testified that he told Counsel that the video would prove that Ms. Long was lying. He also stated that Ms. Long's phone record would have proven that they knew each other. Post-conviction counsel asked the Petitioner whether Ms. Long had been subpoenaed for the post-conviction hearing, and he indicated that she had but that she was unavailable.

On cross-examination, the Petitioner agreed that the jury had heard his theory at trial. He agreed that he had written a letter to his girlfriend while in jail stating that he had robbed Ms. Long at gunpoint, but he stated that it "wasn't true." He also agreed that he had asked his girlfriend to "take" the aggravated robbery charge "for him." The Petitioner stated that he had no proof that the incident in the Circle K was merely a theft. The Petitioner agreed that he had been convicted previously of more than thirty felonies involving theft and vehicle burglaries. The Petitioner was shown a handwritten letter titled "Why I Robbed the Store," and he agreed that he had written it to Counsel but stated that his admission was "beside the point."

The Petitioner testified that he had written to counsel asking why they had not met and that the Petitioner referred to the man in the video recording taken from inside the Circle K store as the "suspect." He agreed that he had offered "multiple" versions of what had happened during the incident, including that his girlfriend had robbed the store and that another black male had robbed the store.

On redirect-examination, the Petitioner testified that he wrote several letters to counsel in addition to the ones shown to him during the hearing. In one of those letters, the Petitioner "finally" told the truth about what had happened, specifically that he and

12

Ms. Long had set up a fake robbery to hide a drug transaction. He maintained that the video recording corroborated his story.

Counsel testified that he was employed by the Public Defender's Office and had been a licensed attorney for eleven years and had handled "several hundred" criminal cases, with one hundred percent of his time being devoted to indigent clients. He testified that he represented the Petitioner at trial. Regarding cell phone records, Counsel stated that the Petitioner did not provide him with his own phone number to obtain his records and never made a request for Counsel to obtain Ms. Long's phone records. Counsel recalled that the Petitioner requested that he do a background check of Ms. Long, but her record did not "provide any type of impeachment material" to use at trial. Counsel stated that he knew of no legal grounds by which he could obtain a urine sample from Ms. Long.

Counsel stated that there was nothing he would have done differently when representing the Petitioner that would have affected the outcome of his case. He testified that he handled the Petitioner's case on direct appeal and successfully obtained relief regarding the issue of sentencing, resulting in a remand and resentencing.

On cross-examination, Counsel agreed that he met with the Petitioner at the county jail. Counsel agreed that the Petitioner told him that he knew Ms. Long before the day of the robbery. He stated that he did not interview Ms. Long and that he recalled she was living in Florida and only came to town for a night for the trial. Counsel stated that he was never told that she had been fired from a previous job or anything about syringes. Counsel recalled that he argued in front of the jury that Ms. Long knew the Petitioner and so could not have been placed in fear, making the Petitioner not guilty of aggravated robbery. Counsel testified that the Petitioner raised his mental health as an issue, and also wanted his brother to testify at trial because they looked alike, but the Petitioner never said it was his brother who robbed the store.

Following the hearing, the post-conviction court stated that the Petitioner had failed to present any evidence to support his claims that Counsel was ineffective for failing to subpoena Ms. Long's phone records. The post-conviction court stated that the Petitioner's motion was denied, and stated that any other claims made in the petition also were denied due to a lack of proof. In a subsequently issued order denying the motion, the post-conviction court specifically accredited Counsel's testimony and did not credit the Petitioner's testimony. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that he received the ineffective assistance of

counsel because Counsel failed to present evidence at trial that the Petitioner and Ms. Long had a prior existing relationship before the robbery in the convenience store and because he failed to present evidence that they were "co-conspirators" in the robbery. Without this evidence, the Petitioner contends that Counsel failed to present a defense. The State responds that there was no evidence of the Petitioner's and Ms. Long's relationship, other than the Petitioner's own testimony, which was not accredited by the post-conviction court. Thus, the State argues that Counsel was not ineffective for failing to present any evidence in this vein. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's representation fell below an objective standard of reasonableness. *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In this case, the Petitioner claims that Counsel was ineffective for failing to present evidence that the Petitioner and Ms. Long, the victim, were actually co-conspirators who had planned the robbery ahead of time. Aside from his own testimony,

15

the Petitioner offered no evidence to support his assertion at the post-conviction hearing. While he contended that Ms. Long's phone records would have shown they were in contact prior to the robbery and damaged her credibility at trial, he did not offer those phone records. Counsel testified that he argued in front of the jury that the Petitioner and Ms. Long knew each other, thus negating the fear element of aggravated robbery. However, he also recalled that the Petitioner did not request that her phone records be obtained and did not provide his own phone number to obtain his phone records. Ms. Long did not testify at the post-conviction hearing. Other than the Petitioner's testimony, no evidence was presented at the post-conviction hearing to support his claim that he and Ms. Long knew each other and conspired in the robbery. The State provided a letter at the post-conviction hearing, written by the Petitioner, in which he confessed to robbing the convenience store.

The post-conviction court found that Counsel's representation was not ineffective and it discredited the Petitioner's testimony. We conclude that the post-conviction court's decision was supported by the evidence; indeed, no evidence was presented to support the Petitioner's theory. He is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE